***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Defendant was self insured at the time of the accident.
3. Plaintiff was an employee of defendant on July 13, 1999, the date of the alleged injury.
4. At the time of the accident, plaintiff's compensation rate was $457.09.
5. The sole issue to be determined is whether plaintiff's current symptomology is related to a compensable condition.
6. An indexed and paginated set of documents was admitted as stipulated exhibit 1 which included: rehabilitation and medical records, the Pre-Trial Agreement, medical bills, Industrial Commission forms, accident report, interrogatories, employment file, and a recorded statement of plaintiff. The Pre-Trial Agreement is incorporated herein by reference in its entirety.
 ***********
After oral argument before the Full Commission and with permission of the Full Commission the parties stipulated to 14 pages of medical records and notes of Dr. James E. Rice.
 ***********
Based upon all of the competent evidence of record and reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. On July 13, 1999, plaintiff was employed by defendant as a nurse. At approximately 3:30 a.m. plaintiff was assisting in the transfer of a 250+ lb patient from a stretcher to a bed. Plaintiff was on the other side of the bed and reached over the bed to the stretcher to get hold of the patient's lower body. During the transfer the patient shifted weight or resisted the effort due to pain in her leg causing her to pull excessively on plaintiff's arms resulting in almost immediate discomfort in plaintiff's back and left arm and hand. Plaintiff reported this incident to her supervisor soon thereafter and was given a Motrin for pain. She did not seek immediate medical attention for her injury and was able to finish working her shift. It was never disputed that this incident occurred or that plaintiff was injured at this time. Defendant accepted the claim pursuant to a Form 60.
2. Plaintiff has a history of Harrington Rod instrumentation in 1979 for treatment of scoliosis. Plaintiff had worked for Highsmith Rainey (now incorporated into the Cape Fear Valley Medical Center) from January 1999 as a full time Medical Surgery Nurse.
3. On the day after the accident, plaintiff presented at the Highsmith Rainey Memorial Hospital Emergency Room for increased pain in her back and left arm. There were two sets of records made on this visit and two pain diagrams were completed. Both sets of records indicate the nature of plaintiff's injury from the night before and make mention of her prior back problems, specifically referring to her Harrington Rod placement surgery. On both sets of the pain diagrams X marks were placed across her lower lumbar region and on one set of the reports an arrow is drawn from the left shoulder down toward the hand. X rays were obtained of her lumbar spine on this visit. Other than the Physician Record there was no dictated note from the treating physician for that visit or any type of indication that describes what the marks meant on the diagram or the extent of her physical examination. The clinical impression on that date was acute myofascial lumbar strain and acute low back pain. She was prescribed Flexeril and Vicodin and discharged.
4. On July 20, 1999, plaintiff was evaluated and treated at Occupational Health Services. She was examined for Myofascial back strain and was released to work with the following restrictions : no lifting, no prolonged standing or walking and no climbing, bending or stooping. She was advised to continue taking her prescriptions and to follow up the next week. Plaintiff was assigned a medical case manager, Ms. Geralyn Kleffman, and was interviewed by her on July 27, 1999. Plaintiff related the same facts surrounding her injury. She was evaluated with a lumbar CT scan. Her medical care was transferred to Dr. Rice.
5. On July 29, 1999, plaintiff was seen for the first time by Dr. Rice at Sandhills Orthopedic and Spine Clinic, PA. Prior to the examination, she was instructed to complete at Patient Pain Drawing. On this diagram she indicated a burning and aching in her lumbar spine. She also indicated under the section Pain in arm(s) compared with neck as being "less than," and in her own handwriting she wrote in the words JUST LEFT HAND NUMB. Also she indicated in the section "Pain in leg(s) compared with back as being, `less than," and wrote in JUST NUMB.
6. Plaintiff was also instructed to fill out a Patient History Form. Question #23 on this sheet states "Please add any other information you would like to include, or additions to your answers to previous questions." Plaintiff wrote "numbness from buttocks to back of legs to bottom of feet and toes. Left hand swelled on 07-13-99 still feels like swelling, numb tingling on left side of leg and toe. Although plaintiff specifically made mention of her concerns with her hand going numb and feeling like it was swollen, Dr. Rice did not address this problem during this visit. Dr. Rice did not mention these complaints at all in his note of the same day. His examination on this date consisted primarily of her lower back complaints and his clinical impression was sciatica. This is different than the diagnosis that she received at the Emergency Room and at OHS. Dr. Rice prescribed a Medrol Dosepack and Flexeril and plaintiff was instructed to follow up in 10 days with no working until then.
7. Plaintiff remained out of work under Dr. Rice's instructions. On August 2, 1999 plaintiff spoke with her medical case manager, Ms. Kleffman, regarding her progress. According to Ms. Kleffman's report dated 8/30/99, she noted on 8/02/99 "Phone call to client. Some improvement noted with Medrol Dose Pak, however pain is still persistent at all times. Complaining of upper body and facial numbness."
8. Plaintiff was seen by Dr. Rice again on August 4, 1999. Ms. Kleffman also attended this appointment. Her note from that date states "Pain and numbness in upper body continues along with back and leg pain. Bizarre symptoms noted by Dr. Rice." Again, Dr. Rice did not evaluate her for anything other than her lower back pain even though he made mention of symptoms with an unknown etiology. His diagnosis on this date changed to lumbar strain. He advised her to try Indocin and follow up in 2 weeks.
9. On August 5, 1999 plaintiff had to be transported to the Emergency Room by her husband due to numbness of the left arm, left leg, left neck and right foot. She gave the same history regarding her original injury. On this date she stated that while seated she heard "pop" in the side of the neck and that her left arm went limp. There was no stiffness noted in the neck. A CT scan of the head was normal and x-rays were taken of the Cervical, Thoracic and Lumbar spine. An MRI was performed on her brain, but not her cervical spine. It should be noted that plaintiff reported upper body pain and numbness on August 2 and August 4, prior to the "pop".
10. Plaintiff followed up with her family physician, Dr. Robinson 8-9-99 per her discharge instructions from the hospital. His impression on this date was "1) Left upper extremity numbness and paresthesia probably secondary to upper extremity strain from lifting accident and 2) Lower back pain with a suggestion of lumbar radiculopathy in the form of paresthesia and numbness."
11. Plaintiff remained in contact with Ms. Kleffman in order to facilitate and coordinate her medical treatment. During a telephone conversation with her on 8-16-99 she noted that plaintiff continued to work with pain and numbness. Plaintiff participated in a Functional Capacity Evaluation on 8-18-99 under the instructions of Dr. Rice. The FCE was conducted by CFVMC — the report said that due to inconsistencies noted during testing, as well as high coefficients of variation, heart rate date, positive 5-point Jamar and positive Waddell's signs, the results of the FCE cannot be considered valid.
12. Plaintiff followed up with Dr. Rice on August 20, 1999 as scheduled. Again Dr. Rice made note of her continued complaints, but rather than follow up regarding their origin, he noted that he had been advised by Ms. Kleffman that plaintiff had significant pre-existing back problems. This should have been apparent from her extensive scarring on her back from previous surgery. Plaintiff also saw Dr. Robinson on this date. He made extensive notes regarding the numbness she was experiencing and specifically the areas of her face and left upper extremity. He also noted that this was not a constant phenomenon but that she said "it would come and go."
13. Plaintiff continued to follow doctors' instruction and remained working at the hospital under light duty restriction. Ms. Kleffman's monthly report indicated that plaintiff continued to experience intense pain but she tried to deal with it and work through it. She began to experience increase levels of pain during September. She was seen at the ER on September 11, 1999 for severe back pain and was seen on September 14, 1999 in Dr. Rice's office with complaints of increasing numbness in her back. His impression on this date was low back pain, continue light duty and try Elavil for pain. Again nothing was done to address her increasing pain and numbness and no specific diagnosis had yet been reached.
14. On September 28, 1999, Dr. Robinson was contacted by Ms. Kleffman at which time he suggested an MRI. In Ms. Kleffman's notes from that date she states that she told Mr. Carter of "the inappropriate nature of MRI." During that month plaintiff continued to ask permission to see another physician. On the Outcome/Comments section of Ms. Kleffman's 9/30/99 report she states "no new injuries have occurred and a diagnosis of low back pain (chronic) has been assigned by the E.D. in addition to Dr. Rice. It would seem apparent that based on this statement that Nurse Kleffman did not feel that plaintiff suffered a new or different injury.
15. Plaintiff was seen by Dr. Rice on 10-13-99 for continued complaints and a lumbar myelogram and post myelogram CT scan and EMG/NCV were ordered. Results from the tests came back unremarkable. By the end of October plaintiff's condition was continuing to deteriorate and she was not able to attend work on a regular basis, even with her limited duties. A second opinion was approved for November 4, 1999 with Dr. Jaufmann. Plaintiff was participating in a home exercise program which was to be completed by 12-10-99.
16. Plaintiff was initially seen by Dr. Jaufmann on November 4, 1999. He reviewed her medical treatment, restrictions and test results with her. He did not recommend surgery or offer any alternative treatments although he did recommend another FCE.
17. Plaintiff was seen on November 11, 1999 in Dr. Rice's office. He noted that there was essentially no change in her condition, and since he had no objective findings that there may be a significant functional component involved. Although he reviewed the findings of her prior studies he did not order any further testing or address her continued complaints of facial and upper extremity numbness. Plaintiff had her final evaluation by Dr. Rice on December 10, 1999 at which time she was released from his care at MMI. He did not think she had any ratable impairment at that time although he had noted her to use her TENS unit on a permanent basis.
18. After being discharged from Dr. Rice's care, plaintiff was referred for treatment at Highland Neurology Center with Dr. Richard Serano to be evaluated for possible multiple sclerosis. Dr. Serano had treated plaintiff in 1998 for low back complaints and was familiar with her history. On March 16, 2000 Dr. Serano evaluated plaintiff and felt that she did not have multiple sclerosis but symptoms warranted an MRI of her cervical spine. Plaintiff's cervical MRI dated 5/15/00 showed "a left posterior disc herniation at the left C6-7 level contributing to effacement and posterior displacement of the cord. With this ultimate diagnosis for her ongoing problems, Dr. Serano referred her back to Dr. Jaufmann for a neurosurgical consultation.
19. Dr. Jaufmann recommended physical therapy and static traction to see if plaintiff would get any relief from her pain. After trying conservative treatment Dr. Jaufmann recommended surgical intervention for plaintiff's herniated disc in her neck. This surgery was postponed until after the birth of her child and was never performed because defendant refused to authorize it.
20. Dr. Jaufmann testified: "if there's a doctor's report describing radicular symptoms a day after the reported injury, then you would have to say, you know, gee, the two are probably most likely — more likely than not related." Jaufmann deposition, page 28, lines 15-19. Although there was not a doctor's report describing radicular symptoms, there was a nurse's report. The plaintiff herself indicated such symptoms on the intake forms for Dr. Rice and the rehabilitation nurse noted them in her reports.
21. Dr. Jaufmann was asked: Q. "Would the nature of her injury, meaning moving a large patient, likely cause cervical injury?" His answer was: A. "It could cause an injury like that. Anything that strains or puts pressure on the disc could be the final thing that pushes the disc out against the nerve." He also testified that injury to a disc in the neck could also manifest in problems in the body below that level of the spine.
22. Dr. Robinson testified that because plaintiff had not improved after a week, he began to wonder if there was something else that could have been injured.
 Did she get an acute disc bulge? Did she get a herniation, because she had mentioned in the past, I think her initial visit, some paresthesia, numbness-type symptoms in both of her lower extremities. So my plan was to try to put her in the hospital and obtain an MRI of her spine.
However, before he could order an MRI, he was told that the workers compensation insurance carrier had referred his patient to Dr. Rice and that he was not authorized by the carrier to continue treatment.
23. Dr. Robinson was asked: Q. "Would these symptoms necessarily occur immediately after an injury or could they develop, again, weeks following the injury?" He responded: A. "Well, usually I think we would try to look more for the proximity of the injury and then the development of symptoms. I think that makes a much stronger case."
24. Although Dr. Robinson did not think the lifting incident of July 13, 1999 was the cause of plaintiff's cervical herniation and thought the August 5 neck pop was the most likely cause, Dr. Robinson was not aware that plaintiff had complained of cervical symptoms immediately after July 13. His opinion that the July 13 incident did not cause the cervical herniation is therefore given little weight.
25. Plaintiff made complaints at the Emergency Department the very next day after the July 13, 1999, specific traumatic incident of her left arm bothering her. She also made complaints to Ms. Kleffman and Dr. Rice prior to August 5, 1999. However, no MRI was performed on plaintiff's neck until May 2000 after she was released from Dr. Rice's care.
26. Although there were physical indications of a possible cervical disc herniation immediately following the specific traumatic incident of July 13, 1999 and no indications of any cervical disc herniation before that date, no physician was able to diagnose the cervical disc herniation until a cervical MRI was performed in May of 2000. As a result, none of the physicians was willing to testify unequivocally that the July 13, 1999 specific traumatic incident was the cause of the cervical herniation. However, there was medical testimony to the effect that if symptoms of a possible cervical herniation were present close in time to the July 13, 1999 specific traumatic incident, then it was more likely than not the cause of the herniation. The Full Commission, upon a review of all of the evidence, finds there were such symptoms present immediately after the July 13 incident and the Full Commission finds as a fact that the July 13 incident caused the cervical herniation not finally medically diagnosed until the May 2000 MRI results were available.
27. Although plaintiff experienced a pop in her neck on or about August 5, 1999 and sought emergency room treatment, the Full Commission finds that she did not sustain a new injury. The pop and what followed were the natural progression of the trauma experienced on July 13, 1999.
28. Up to the hearing before the Deputy Commissioner, plaintiff was unable to work due to the pain in her neck and back as well as the side effects of the medications she had been taking, all as a result of her compensable injuries.
29. Plaintiff is not yet at MMI and is entitled to surgery to correct her cervical herniation as recommended by Dr. Jaufmann. Her compensable injuries are likely to require medical treatment for some time into the foreseeable future.
30. Plaintiff's attorney withdrew from the case after losing before the Deputy Commissioner and is therefore not entitled to the full fee to which she otherwise would have been entitled. A fee of 10% of the compensation due by the date of this Opinion and Award is deemed reasonable and appropriate.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an admittedly compensable specific traumatic incident on July 13, 1999. N.C. Gen. Stat. § 97-2(6).
2. Although the medical providers treating plaintiff failed to have a cervical MRI taken close in time to the specific traumatic incident, considerable objective corroborative evidence shows that the incident resulted in injury to the neck as well as lower portions of the back. The greater weight of the evidence points conclusively to the specific traumatic incident being the cause of the neck injury. It is fundamental under the Worker's Compensation Act that plaintiff must describe a causal relationship between the injury and her employment in order to recover.Bartlett v. Duke University, 284 N.C. 230, 200 S.E.2d 193 (1973). It is equally clear that the evidence presented to establish causation must rise above the level of speculation. Gilmore v. hope County Board ofEducation, 222 N.C. 358, 23 S.E.2d 292 (1942). Certainly the complaints of pain immediately following an accident rises above the level of speculation that the injury was a result of the accident.
3. In the compensation cases holding medical testimony unnecessary to make a prima facie case of causation, the distinguishing features are an uncomplicated situation, the immediate appearance of symptoms, the prompt reporting of the occurrence by the worker to his supervisor and consultation with a physician, and the fact that the plaintiff was theretofore in good health and free from any disability of the kind involved. A further relevant factor is the absence of expert testimony that the alleged precipitating event could not have been the cause of the injury. Slizewski v. International Seafood, Inc., 46 N.C. App. 228,264 S.E.2d 810 (1980). Here, there was an admitted specific traumatic incident, the immediate appearance of symptoms, the prompt reporting of the occurrence by the worker to her supervisor and consultation with a physician. There was no evidence of a cervical herniation prior to the July 13, 1999 specific traumatic incident. Prior to the incident plaintiff was theretofore in good health and free from any disability of the kind involved. Although Dr. Serano testified that he could not establish cause and effect without an MRI immediately prior to July 13, 1999 and one immediately after July 13, 1999, there was other medical testimony that the occurrence of symptoms of a herniated cervical disc following a trauma more likely than not indicate that the trauma caused the herniation.
4. Plaintiff is entitled to compensation at the rate of $457.09 per week for each week she was unable to work after July 13, 1999 by reason of her compensable injuries. She is entitled to receive this amount until she is able to return to work at the same or greater wages or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have the defendant provide and pay for such medical treatment as is reasonably necessary to effect a cure, relieve pain or lessen the period of disability, including cervical surgery as recommended by Dr. Jaufmann. The Full Commission determines that there is a substantial risk of the necessity of future medical compensation. N.C. Gen. Stat. §§ 97-25 and 97-25.1.
6. Plaintiff's former counsel is entitled to a reasonable attorney fee of 10% of the lump sum compensation ordered paid. N.C. Gen. Stat. §97-90.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fee hereafter awarded, defendant shall pay temporary total disability compensation in the amount of $457.09 per week directly to the plaintiff for each week after July 13, 1999 that plaintiff was unable to earn wages by reason of her compensable injuries. Such compensation as has accrued to the date of this Opinion and Award shall be paid in a lump sum, 90% to plaintiff and 10% to plaintiff's former attorney. After payment of the lump sum, defendant shall thereafter bring all compensation to a current basis and shall pay $457.09 weekly directly to plaintiff. Defendant shall pay 8% interest on all unpaid compensation, with the interest to be calculated from the date of the hearing before the Deputy Commissioner until actually paid.
2. Defendants shall pay, or reimburse those who paid, all medical providers for service rendered to plaintiff by reason of her compensable injuries to the extent those services tended to provide relief, to effect a cure or to help to return her to gainful employment. Since the Full Commission has found that there is a substantial risk of the necessity of future medical compensation, defendants shall pay future necessary medical compensation.
3. Defendants shall pay the costs.
This 22nd day of August 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING A WITHOUT WRITTEN OPINION:
 S/_______________ DIANNE C. SELLERS COMMISSIONER